Alonzo VEREEN and Technical Data
Services, Inc., Appellants,

v.

Verna E. CLAYBORNE, Appellee.

No. 91–CV–970.

District of Columbia Court of Appeals.

Argued Jan. 14, 1993.
Decided April 30, 1993.

Natalie O. Ludaway, with whom Frederick A. Douglas, Washington, DC, was on the brief, for appellants.

Brenda L. Hopkins, Washington, DC, for appellee.

Before FERREN, FARRELL and KING, Associate Judges.

FERREN, Associate Judge:

The trial court, sitting without a jury, entered judgment for plaintiff-appellee, Verna E. Clayborne, in the amount of $10,-499.59 (representing principal and interest owed), plus $1,574.94 in attorney's fees, on Clayborne's claim for payment due on a promissory note from defendants-appellants Alonzo Vereen and his company, Technical Data Services, Inc. (collectively "Vereen"). The court also entered judgment against Vereen on his counterclaims for breach of contract, quantum meruit, unjust enrichment, and defamation. On appeal, Vereen contends that the evidence shows he performed services for Clayborne in lieu of paying the balance due on the note and that he accordingly owes her no money. He therefore argues that the trial court erred in finding that Vereen did not perform any services at Clayborne's New Jersey Avenue property and that the parties did not have a contract for the performance of services at Clayborne's A Street, N.E., property.[1] Vereen further contends that even if he did not have valid contractual claims offsetting any balance due on the note, the trial court erred in rejecting his counterclaim based on quantum meruit and unjust enrichment. Finally, as to his separate counterclaim for defamation, Vereen contends the trial court erred in finding that Clayborne's statements, while defamatory, were not false. We reject virtually all Vereen's contentions and affirm the trial court's rulings in all respects save one: we must remand for further proceedings on Vereen's defamation claim based on one statement by Clayborne which Vereen did prove was both defamatory and false.

I.

At trial, the parties stipulated that sometime around July 20, 1989, Clayborne lent Vereen $17,000, secured by a promissory note. They also stipulated that Vereen repaid $10,000 on October 2, 1989. The controversy arose because Clayborne sought payment of the remainder of the principal with interest and attorney's fees, as provided in the note. Vereen answered that he had performed engineering and architectural services for Clayborne and that the value of those services should offset any amount remaining due on the promissory note, under a theory of breach of contract or, at least, a theory of quantum meruit and unjust enrichment.

Between 1986 and 1988, Vereen and Clayborne were romantically involved.

---

1. Vereen also argues that the evidence at trial does not support the trial court's finding with respect to the credibility of one of Vereen's witnesses, Greg Upshaw. We perceive no basis in the record for concluding that the trial court should have evaluated Upshaw's testimony differently and for changing the court's rulings as a result.

Vereen testified that twice in early 1989 he examined a property owned by Clayborne on New Jersey Avenue and prepared plans and specifications relating to it, but that those documents disappeared during a burglary of his office in July 1990. Vereen acknowledged, however, that during his interactions with Clayborne "[t]here was nothing definitive about a payment for [his services regarding the] New Jersey [Avenue property]." In contrast, he claimed that he explicitly told Clayborne he expected to receive fees for his services when she wanted him to work on a second project, on A Street. Vereen testified that in the summer of 1989, he examined the A Street property, which Clayborne later purchased, to determine what renovations were needed. Vereen further testified that he visited the A Street property four times: twice with Alvin Courtney, the property's caretaker; once with Clayborne; and once with Greg Upshaw, an engineer employed by Vereen's company, who corroborated at trial Vereen's account of their site inspection. Vereen also testified that on September 5, 1989, he drafted a letter evaluating the condition of the A Street property for Clayborne to use in obtaining the property and in financing its purchase. Vereen then testified that when Clayborne accepted his $10,000, they verbally agreed that the balance of his debt had been satisfied by his work on the two properties. Vereen claimed that Clayborne only began insisting that he owed her the balance of the loan after she encountered difficulties obtaining financing on the A Street property.

In her testimony, however, Clayborne said that Vereen never visited the New Jersey Avenue property—indeed, that she had sold it in November 1988, several months before Vereen supposedly worked there. Clayborne further testified that Vereen volunteered to write the letter concerning the A Street property as a favor, that she assisted him in writing the letter, and that she never had visited the A Street property with him. Clayborne also denied ever having an understanding with Vereen that his services would partially satisfy his debt. Moreover, contrary to Vereen's testimony, Alvin Courtney testified that he had accompanied Vereen to the A Street property only once, not twice.

The parties agreed that after Vereen had paid Clayborne the $10,000, she began calling him in order to get him to pay her the balance. They also agreed that Clayborne called and sent letters to various individuals and organizations who might put pressure on Vereen to pay. Vereen testified that these communications, which included accusations that Vereen engaged in unethical business practices, harmed his business.

In addition to the communications about Vereen's business, Clayborne wrote a letter in July 1990 to Joan Palmer, one of Vereen's business associates, with whom he also had a personal relationship. In that letter, Clayborne told Palmer that Vereen was "not divorced." At trial, however, Vereen entered in evidence a divorce decree dated May 25, 1988, more than two years before Clayborne wrote the letter to Palmer. Vereen testified that after Palmer received Clayborne's letter, Palmer severed her relationship with Vereen, ending both its personal and business aspects.

## II.

According to D.C.Code § 17–305(a) (1989 Repl.), in a case tried without a jury this court may review both the facts and the law, "but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." This court has interpreted D.C.Code § 17–305(a) to be "indistinguishable from the 'clearly erroneous' standard" under Super.Ct.Civ.R. 52(a). *United States v. Felder*, 548 A.2d 57, 61 n. 4 (D.C.1988) (citing *Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C.1983) (per curiam) and *Hummell v. Koehler*, 458 A.2d 1187, 1191 (D.C.1983)).

■ The trial court found that Vereen "did no work on the property at 1701 New Jersey Avenue, that he simply made the whole thing up; that is, he lied about it." The trial court noted that Vereen's claim regarding the New Jersey Avenue property rested entirely on his own testimony, uncorroborated by any witness or document.

The trial court decided not to credit Vereen's testimony, instead relying on Clayborne's testimony that she had sold the property "at least three months before Mr. Vereen stated he did the work." Having examined the record and applied the required deferential standard of review, we conclude that sufficient evidence supports the trial court's finding that Vereen did no work on the New Jersey Avenue property.

■ With respect to the A Street property, the trial court found that Vereen made only one brief inspection. The court also found that Clayborne assisted Vereen in preparing the letter introduced in evidence, so that Vereen's work totalled no more than two hours. The court then concluded that Clayborne owed Vereen nothing for those two hours of work.

More specifically, the trial court found no credible evidence that Vereen and Clayborne had an express contractual agreement for Clayborne to pay for the services Vereen performed in producing the letter. *See Richardson v. J.C. Flood Co.*, 190 A.2d 259, 261 (D.C.1963) (express contracts exist when terms stated by parties). The record supports this finding.

■ Next, the trial court rejected Vereen's claim for payment based on quantum meruit or unjust enrichment. "Quantum meruit may refer to either [1] an implied contractual or [2] a quasi-contractual duty requiring compensation for services rendered." *TVL Assocs. v. A & M Constr. Corp.*, 474 A.2d 156, 159 (D.C.1984) (citing *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549 n. 5 (D.C.1981)). As to the first theory of quantum meruit, "[a]n implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only

in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973) (citing *Roebling v. Anderson*, 103 U.S.App.D.C. 237, 241, 257 F.2d 615, 619 (1958)). This court has previously established the requirements for recovery on a theory of quantum meruit under a contract implied in fact:

> (1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to charged that the [person rendering the services] expected to be paid by him or her.

*In re Rich*, 337 A.2d 764, 766 (D.C.1975); *see also Brown v. Brown*, 524 A.2d 1184, 1190 (D.C.1987); *TVL Assocs.*, 474 A.2d at 159. In applying this test, the trial court concluded that Vereen had not proved the fourth element. Clayborne testified that Vereen offered to draft the letter as a favor to her, and the trial court found circumstantial evidence corroborating Clayborne's testimony on this point. After evaluating all the evidence, the trial judge said: "a couple of hours worth of work done in this fashion I would not expect to be something [Vereen] would charge [Clayborne] for." We agree that the record supports the trial court's finding that Vereen had prepared the letter for Clayborne as a favor, not in expectation of compensation.[2]

■ The trial court also examined Vereen's services for Clayborne under the sec-

---

2. On appeal, Vereen cites *Brown*, 524 A.2d at 1186, for the proposition "that ordinarily, in the absence of a close family relationship, a promise to pay will be *implied in law* when one party renders valuable services that the other party knowingly and voluntarily accepts." (Emphasis added). Vereen attempts to apply a doctrine concerning implied-in-*law* contracts (quasi-contracts), discussed in the next paragraph, to the requirements for an implied-in-*fact* contract. That will not do. In attempting to prove the existence of an implied-in-fact contract, Vereen

must heed the rule pronounced in *H.G. Smithy Co. v. Washington Medical Ctr.*, 374 A.2d 891 (D.C.1977): "Unless a recipient of services is put on notice by unambiguous circumstances that the party providing those services is working for the recipient with the expectation of compensation from the recipient, the recipient cannot be held liable for a commission even if the recipient makes use of those services." *Id.* at 894 (citing *Bloomgarden*, 156 U.S.App.D.C. at 117, 479 F.2d at 209).

ond theory of quantum meruit, based on an implied-in-law- or quasi-contract. This particular quantum meruit analysis is more commonly known as a theory of unjust enrichment. "A quasi-contract ... is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." *Bloomgarden*, 156 U.S.App.D.C. at 116, 479 F.2d at 208 (footnote omitted); *see also 4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C.1992); *Brown*, 524 A.2d at 1186; *supra* note 2. For Vereen to recover on a quasi-contractual claim, he must show that Clayborne was unjustly enriched at his expense and that the circumstances were such that in good conscience Clayborne should make restitution. *See Bloomgarden*, 156 U.S.App.D.C. at 119, 479 F.2d at 211; *see also 4934, Inc.*, 605 A.2d at 55; *Brown*, 524 A.2d at 1186–87; *H.G. Smithy Co.*, *supra* note 2, 374 A.2d at 895; *Zaleski v. Congregation of the Sacred Hearts of Jesus & Mary*, 256 A.2d 424, 427 n. 8 (D.C.1969).

■ The trial court found that Clayborne "did not end up using this letter in any way" and that Vereen did not introduce any evidence demonstrating that Clayborne realized any benefit from the letter. Whether Clayborne benefitted from the letter is a question of fact for the trial court to decide from the evidence. *Compare Zaleski*, 256 A.2d at 427 (trial judge properly concluded that recipient in fact realized no benefit from services provided) *and Anderco, Inc. v. Buildex Design, Inc.*, 538 F.Supp. 1139, 1143 (D.D.C.1982) (recipient received no benefit despite "strenuous efforts" by service provider) *with TVL Assocs.*, 474 A.2d at 159 (trial court did not err in finding benefit to recipient from services provided). After reviewing the record, we conclude it supports the trial court's finding that Clayborne did not realize any benefit, and thus did not unjustly enrich herself, from the letter Vereen drafted.

The trial court therefore did not err in rejecting Vereen's counterclaims based on services allegedly performed with respect to Clayborne's New Jersey Avenue and A Street properties.

### III.

We now turn to Vereen's counterclaim for defamation. Vereen contends the trial court, while finding that Clayborne published "many" defamatory statements about Vereen, committed reversible error in ruling that Vereen failed to prove that any statement was false. Vereen argues that the court should have specified which of Clayborne's statements it found defamatory and, in particular, should have found that Vereen had proved at least two categories of statements were false: Clayborne's statements to several individuals and organizations that Vereen engaged in unethical business practices, and Clayborne's statement in her letter to Joan Palmer—Vereen's business associate and social companion—that Vereen was "not divorced."

We briefly look, first, at the law of defamation in the District of Columbia, and then examine whether the trial court correctly applied the law in ruling on the statements Vereen complains about.

### A.

■ In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that, in defamation actions against media defendants by plaintiffs who are not public figures, the states—"so long as they do not impose liability without fault"—are free to "define for themselves the appropriate standard of liability." *Id.* at 347, 94 S.Ct. at 3010. In two cases interpreting *Gertz*, involving nonpublic figure plaintiffs against media defendants, this court announced the burden a defamation plaintiff must carry to survive a motion for summary judgment, as well as the level of fault the plaintiff must prove to justify liability. Specifically, a plaintiff must be prepared to show that the publication was both "false"

and "defamatory," [3] *Harrison v. Washington Post Co.*, 391 A.2d 781, 783 (D.C.1978), and at least was "negligent," *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 80 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). Recently, we have extended these criteria to defamation actions by nonpublic figures against nonmedia defendants. *See Moss v. Stockard*, 580 A.2d 1011, 1022–23 n. 23 (D.C.1990).

Under District of Columbia common law, a defamed plaintiff was entitled to "a maximum standard of protection, strict liability, ... tempered by certain recognized privileges." *Phillips*, 424 A.2d at 87. In *Moss*, however, we concluded that common law strict liability was no longer available against nonmedia defendants; we noted that the Supreme Court had "specifically rejected the notion that the applicability of *Gertz* should turn on" the distinction between media and nonmedia defendants. *Moss*, 580 A.2d at 1023 n. 23 (citing *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)).[4] We further recognized that the

standard civil jury instructions, which were revised in 1985, reflect this evolution of the law of defamation. *See id.* at 1022 & n. 23; STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA Nos. 17–1 to –19 & introduction (discussing changes in jury instructions because of Supreme Court jurisprudence) (1985 Supp.). Consistent with our earlier observations, we now conclude that a nonpublic figure, such as counter-plaintiff Vereen, in order to recover damages, must prove that a nonmedia counter-defendant, such as Clayborne, negligently uttered or published false and defamatory statements about him.[5]

**B.**

The trial court found that Vereen "has certainly proven and it's really not disputed, that [Clayborne] published a number of statements about him, and about [Technical Data Services, Inc.]." The trial court further found "that many of those statements were defamatory in the sense that they tended to hold him and his corporation up to ridicule, or to damage him and his corporation's reputation." *See supra* note 3.

---

3. "A statement is 'defamatory' if it tends to injure the plaintiff in his [or her] trade, profession or community standing, or lower him [or her] in the estimation of the community." *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C.1990).

4. A year after *Dun & Bradstreet*, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court indicated a residual deference to the common law in certain circumstances: "When the speech is of exclusively private concern and the plaintiff is a private figure, ... the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape." *Id.* at 775, 106 S.Ct. at 1563. While explicitly deciding "that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern," *id.* at 777, 106 S.Ct. at 1564, the Supreme Court declined in *Philadelphia Newspapers* to "consider what standards would apply [when a private] plaintiff sues a nonmedia defendant." *Id.* at 779 n. 4, 106 S.Ct. at 1565 n. 4; *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 n. 6, 110 S.Ct. 2695, 2706 n. 6, 111 L.Ed.2d 1 (1990) (following *Philadelphia Newspapers* in reserving judgment on cases involving nonmedia defendants). This court, however, has indicated that the negligence standard, as well as

the burden of proving falseness associated with that standard, should apply to nonpublic figure plaintiffs confronting both media and nonmedia defendants. *See Moss*, 580 A.2d at 1022–23 n. 23.

5. *Moss* also indicates that, in cases such as this one, the Supreme Court's reasoning in *Dun & Bradstreet* has left the District's law on damages somewhat unsettled and thus perhaps not accurately embodied in the standardized civil jury instructions. *See Moss*, 580 A.2d at 1033–34 n. 40. We need not discuss any potential problem in that area, however, because the issue of damages is not before us. After finding that Vereen did not prove Clayborne's July 1990 letter to Joan Palmer contained a false statement, the trial court stated: "So, apart from the liability problems on the counterclaim there is virtually no credible evidence with respect to damages in the matter." Even if this constituted a finding that no actual damages were proved, we still could not affirm outright on this alternative ground because the trial judge has not yet entered the thicket of "presumed" damages and defamatory statements *per se*. *See Moss*, 580 A.2d at 1033–34 n. 40. Furthermore, Vereen has asked for punitive damages, which the trial court has not discussed. *See Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1209–10 n. 5 (D.C. 1991) (discussing D.C. law of defamation in case generally applying Virginia law).

The trial court then considered whether Vereen had proved "by a preponderance of evidence that any of the defamatory statements published by [Clayborne] are false." The trial court assessed the credibility of the testimony, witness by witness, and found that Vereen "did engage in unethical business practices on various occasions." [6] The court reviewed Vereen's testimony to the contrary and found Vereen altogether incredible: "I believe virtually nothing about what he said in this case." [7] In addition, the trial court concluded that the testimony of Shirley Berry of the Small Business Administration, who said "in essence that she wasn't aware of any unethical business practices on [Vereen's] part," was insufficient to prove that no unethical conduct had actually occurred. [8]

The trial court also found that, in writing to Joan Palmer that Vereen was "not divorced," Clayborne did not make a false statement. The court then concluded that Vereen "has not sustained his burden of proving that [Clayborne] published any false and defamatory statements about him. Defamatory statements, yes; has he proven any of them false, no."

### C.

Vereen claims trial court error in failing to make specific findings as to which of Clayborne's "many" defamatory statements were in fact defamatory. Because Vereen has the burden of proving that particular statements were both defamatory and false, however, the trial court's failure to find particular statements defamatory is irrelevant. Essentially, the court was willing to find virtually any of Clayborne's statements about Vereen defamatory, but

---

6. According to the trial court:

These include making sexual advances to a secretary that he had just hired that day, Marjorie Smith. They include sticking resumes of people into job proposals that did not in fact work for his company as per the testimony of Ms. Marshal. They include phonying up the office not only by bringing in people as Ms. Marshal indicated, but also office machines and blueprints and doctoring it all up to try to fool the Turner Construction folks into thinking they had a real active, going, humming office there. This includes taking advantage of people who loaned him money such as Ms. Clayborne. It includes even frankly the September 5, 1989 letter, Plaintiff's Exhibit 3, for which Ms. Clayborne also bears some responsibility. I find that that particular conduct frankly was somewhat unethical in an attempt to bargain down the 86 year old owner in South Carolina, they basically dummied up a letter indicating that there was all kinds of work that was needed on this property....

7. The trial court made the following veracity findings, among others:

I don't believe Mr. Vereen when he testifies that he never told Mrs. Jones that she could solve her house problems by burning her house down. I find that he did say that, as Ms. Jones testified. Whether he said it in jest or not I don't know, but his denial of ever making such a statement is not credible.

I don't believe Mr. Vereen when he says he never touched Marjorie Smith's leg or made sexual overtures to her. I find that he did that in exactly the way she testified.

I don't believe Mr. Vereen when he says he has never taken advantage of women. I find that he has taken advantage of women, in-

cluding Ms. Clayborne, Ms. Ross, Mrs. Jones, Ms. Smith and Ms. Marshal, and men too, namely Greg Upshaw, who was taken advantage either under Mr. Vereen's version for having not been paid for two years for work that he did back in the summer of '89, or in the way I think that it actually happened being put up to come in here and commit perjury in support of Mr. Vereen's case.

\* \* \* \* \* \*

I don't believe Mr. Vereen when he testified that he never falsely reported a burglary to the police. I think it more likely than not that the July 27, 1990 burglary is bogus. That burglary which conveniently occurred right after Ms. Rose left, I don't think it occurred. I think his report to the police is in all likelihood false.

So, to the extent that Mr. Vereen depends for proof on the falsity of these statements on his own testimony, he is out of luck because his testimony is in every stretch of the imagination not credible with this judge.

8. The trial court reached this conclusion in part by reasoning that "[t]he fact that [Berry] wasn't aware of some unethical conduct doesn't mean it didn't occur." In addition, the court found that "Berry has some credibility problems of her own." Appellant argues that, in making this assessment of Berry's credibility, the trial court improperly took into consideration Berry's behavior observed in the corridor outside the courtroom. Any such error in discrediting Berry's testimony would have been harmless, however, in light of the overwhelming evidence, presented by Clayborne, demonstrating the truth of her statements about Vereen's unethical business practices.

without legal consequence because Vereen proved none of them false. The real issue, therefore, is whether the record supports the trial court's findings that none of Clayborne's defamatory statements alleged by Vereen was false.

Vereen has not included in the record on appeal his original complaint or any subsequent pleadings. Moreover, in his brief on appeal, Vereen refers only generally to alleged statements about unethical business practices. He does, however, cite one particular statement he claims was false: Clayborne's statement to Palmer that Vereen was "not divorced." We conclude that the evidence of record overwhelmingly supports the trial court's findings that Clayborne's defamatory statements about Vereen's unethical business practices, identified of record, were not false. *See, e.g., supra* note 6. Thus, the only remaining issue concerns the statement about Vereen's marital status.

### D.

■ We must conclude the evidence does not support the trial court's finding that Vereen failed to prove the falseness of Clayborne's statement, "He is not divorced," in her letter to Joan Palmer. At trial, Vereen produced a decree evidencing a divorce from his wife, Grace, dated May 25, 1988, more than two years before Clayborne's July 1990 letter to Palmer. The trial court offered two interpretations of Clayborne's statement to explain how this document did not adequately prove the statement was false. First, the trial court read the statement from Clayborne to Palmer as showing no more than Clayborne's understanding as of the time she herself had been romantically involved with Vereen between 1986 and 1988, when he had lied to her about his marital status.

This reading of the statement, "He is not divorced," made two years after Vereen's personal relationship with Clayborne had ended, is clearly erroneous, especially when considered in the context of the sentence next to it: "The unconscionable lies Alonzo told me about his mother, and his wife, Grace, I hope will cause him to pay life's greatest penalties without respite." Plainly, Clayborne meant to convey to Palmer the idea that Vereen was still married to Grace.

■ The trial court's alternative reading of the letter also cannot withstand scrutiny. Although the court begins with the correct assumption that Clayborne meant to say Vereen was still married, the court concluded that Vereen could not prove falseness without also proving that, after his divorce, he had not remarried before Clayborne wrote the letter. We cannot agree. Once Vereen had made a prima facie showing of falseness by producing a decree evidencing a divorce from the woman Clayborne mentioned in the letter as Vereen's wife, the burden of producing rebuttal evidence demonstrating that Vereen had remarried shifted to Clayborne—keeping in mind that Vereen always had the ultimate burden of persuasion on the issue of his marital status at the time of Clayborne's letter to Palmer.[9]

### IV.

After reviewing all of Vereen's claims on appeal, we affirm the trial court's rulings in all respects but one. The trial court's finding that Vereen did not prove the falseness of Clayborne's statement to Palmer, "He is not divorced," is clearly erroneous. We therefore must remand the case to the trial court for further proceedings on this one claim of defamation, consistent with this opinion.[10]

9. Even if Vereen had remarried before Clayborne wrote to Palmer (there is no such evidence of record), his divorce from Grace would still make the statement, "He is not divorced," literally false. We do not need to consider whether such a statement would be false enough to be actionable under the circumstances.

10. Although we conclude that Vereen has carried his burden in proving that one statement by Clayborne was both defamatory and false, any recovery is contingent upon the trial court's finding that Clayborne was negligent in publishing the statement to Palmer—an issue the trial court has not addressed. *See supra* Part III.A. Furthermore, the court has not considered whether Vereen has made the required showing

*Affirmed in part, reversed in part, and remanded.*

of damages. *See supra* note 5 and accompany-
ing text.