**Alice HARRINGTON, Appellant,**

v.

**Braeden TROTMAN, Appellee.**

**No. 06–CV–1294.**

District of Columbia Court of Appeals.

Submitted June 30, 2008.
Decided Nov. 12, 2009.

Alice Harrington, pro se.*

Before RUIZ and BLACKBURNE–
RIGSBY, Associate Judges, and KING,
Senior Judge.

RUIZ, Associate Judge:

Alice Harrington appeals the trial court's judgment in favor of Braeden Trotman's claim for damages. Trotman entered into a contract with Ms. Harrington under which she would do renovation work on a house that Trotman owned. Their relationship did not end amicably, and Trotman sued Harrington, alleging breach of contract, unjust enrichment, conversion, and fraud.

After a bench trial, the trial court denied all of Trotman's claims except the equitable claim for unjust enrichment.[1] The trial

---

* Harrington represented herself *pro se* at trial and on appeal. Appellee, Braeden Trotman, did not file a brief with this court, and, although he was represented at trial, no one has made an appearance on his behalf on appeal. Appellant certified that she mailed a copy of her brief to appellee at his home address at "213 Seaton Place, NE" on October 3, 2007. She later filed a "Motion to Amend to Correct Transposed Address in Filing," where she submitted that Trotman's true address was "312 Seaton Place, NE."

On December 11, 2007, this court ordered appellee to submit a brief accompanied by a motion for leave to file out of time, advising appellee that "[f]ailure to comply with this order shall subject this appeal to being scheduled for consideration on the record and on appellant's brief without further notice." Although there is no indication in the record that appellant resent a copy of her brief to appellee's correct address, the court order was sent to appellee's address at 312 Seaton Place, N.E., Washington, D.C. 20002. Appellee did not respond. We therefore consider the appeal on the record and on appellant's brief. *See* D.C.App. R. 31(c) ("A person who fails to file a brief will not be heard at oral argument unless the court grants permission.")

1. The trial court rejected Trotman's claim of breach of contract. The court found that Trotman based this claim on two theories: (1) the parties entered into an oral contract in mid-December 2003 to complete the work by January 2004; and (2) the parties otherwise agreed to complete the work within reasonable time.

court found that Trotman "has proved by a preponderance of the evidence that [Harrington] has received more money from [Trotman] than the value of the work [Harrington] performed. And that it would be inequitable to allow [Harrington] to keep the excess payment." Appellant claims that the trial court's finding was clearly erroneous because it was based on "fraudulent testimony and unproved documents."

We agree that the award of damages for unjust enrichment must be reversed, because it was error as a matter of law to award damages on a theory of unjust enrichment when the parties had entered into a contract and it was appellee, not appellant, who was determined to have breached the contract.[2]

## I. Statement of Facts

The trial court made the following findings of fact, which we find to be supported by the record:

It is undisputed that the two parties entered into a written contract on July 7th, 2003, under which the defendant Ms. Harrington was to—was to perform an extensive renovation of the row house at 312 Seaton Place, Northwest [sic], . . . that was in the process of being purchased by the plaintiff Bradeon [sic] Trotman.

It's undisputed that the agreement defined the scope of work with a reference or actually more than one reference to a set of blueprints that unfortunately are not in evidence. But certainly were referred to extensively during the testimony.

It's also undisputed that the agreement indicated that the work was to begin by July 1st, 2003, and be completed by August 30th, 2003. Although the agreement did not specify that time was of the essence as part of the contract.

The agreement it is undisputed also stated that [Harrington] was to be paid a total of $88,000.00. Although the agreement also said that certain costs would vary, depending upon the finishes ultimately selected and on other possible surprises that—that may come up or might come up during the demolition work or other aspects of the project.

It also is undisputed on this record that [Harrington] did not begin to work on the project until approximately August 15th, 2003, because [Trotman] did not close on the house until at least July 29th, 2003, or possibly later. Thereby

---

As to the first theory, the trial court found Harrington's testimony "that [she] would not have agreed to such a schedule or such a deadline that was as a practical matter impossible to meet," to be credible. As to the second theory, the trial court also credited Harrington's testimony that the work progressed slowly because Trotman refused to increase the budget to take into account changes in the scope of work, as required by the contract. The court noted that the five-month period Harrington took to do her work was not unreasonable when it took Cifax—the company Trotman hired after terminating Harrington—six to seven months to complete the work.

As to fraud and conversion, the trial court flatly denied these claims as unproven.

**2.** Appellant also challenges the trial court's pre-trial order imposing sanctions for her non-compliance with Trotman's discovery request. The trial court ordered that the defenses asserted in Harrington's answer be stricken, and precluded her from presenting at trial any documents that she had not produced to Trotman during discovery. We note that, notwithstanding the trial court's sanctions striking appellant's defenses, appellant did present her defense and elicited testimonial evidence to support it. See note 1, *supra.* In view of our disposition reversing the judgment for appellee, we need not address the challenge to the trial court's imposition of discovery sanctions.

making it impossible for [Harrington] to begin work back on July 1st, 2003, as initially contemplated in the written contract.

It also is undisputed that [Harrington] performed most of the demolition work called for by the contract. Plus some amount of HVAC work. Some amount of framing. The installation of two windows. And that she purchased certain fixtures for the house, including a Jacuzzi, three sinks, an oven and a front door. The evidence showed without dispute that [Harrinton] was paid a deposit of $8,800.00. Plus three out of five contemplated draw payments of $15,840.00 each, for a total of $56,320.00.

It also is undisputed that [Trotman] terminated [Harrington] in writing on January 12th, 2004. And that [Trotman] ultimately hired a company called Sifax (phonetic) Inc.[3] to complete the renovation job and to replace the roof on the house. And that Sifax Inc. completed the work between May and December of 2004, in approximately six or seven month period after—after Sifax was hired to do the work.

The trial court, as fact-finder, viewed the evidence of the value of the work performed through the lens of "common sense," after commenting that none of the witnesses was particularly credible and that all had a reason to be biased.[4]

The trial court itemized the work that Harrington performed: (1) demolition; (2) HVAC; (3) deconstruction, including removal of a rafter and gravel from the roof; (4) installation of the subfloor in the kitchen, framing in the basement and second floor, repairing joists, and painting; (5) installation of two windows; and (6) purchase of a number of fixtures (Jacuzzi, oven, three sinks, and a front door). Where there was conflicting testimony as to the dollar amount of any of these categories, the trial court determined an amount in-between the two. In cases where only one witness—Harrington—testified to the particular value, the trial court either credited her testimony, or determined a lower amount *sua sponte:*

3. Nathaniel Spinner, who owns and operates the company, testified that the name is spelled "Cifax."

4. According to the trial judge:

> This task requires me to consider the credibility of all three witnesses who testified at the trial concerning the value of that work. In this regard I have to say that none of the witnesses was particularly credible. Both [Trotman] and [Harrington] are obviously biased ... [a]nd whose testimony was often placed in doubt—even further in doubt by the lack of corroborating evidence such as receipts, work schedules.... And such as the absence of a written contract with Sifax.... And by the lack of a specific memory of what things costs or how much time was put in.
> The plaintiff's expert Nathaniel Spinner was also not a particularly persuasive witness.... [H]e gave what I would describe as off-the-cuff estimates of the various categories of work. And then undercut his own testimony by saying the costs of a—of this job if performed for a stranger as opposed to a friend would go ... from between 180 and $200,000.00 to $120,000.00 if the amount of work the defendant had done had been done before he bid on the contract....
> Mr. Spinner also of course is a biased witness having been a personal friend of [Trotman] for many years....
> There also were aspects of Mr. Spinner's testimony that in my view raised additional doubts about his credibility.... [T]hat if you believed his testimony, he actually did this job at a significant loss to his company, which I just find very difficult to believe. I therefore am left to do the best I can with the evidence.... And I recognize that my evaluation of this is hardly scientific.... But it is the best I can do based on my consideration of the witnesses ... [a]nd ... the photographs ... [a]nd my common sense....

[A]s to demolition work for which [Trotman's] expert testified the value was $12,000.00, plus possibly a 15% increase due to the double walls, and for which the defendant said it was worth 20,000 to $25,000.00 I find that work was worth $18,000.00.

As to the HVAC work [which Spinner testified was worth $600 and Harrington as $4,000] ... I find that work was worth $2,000.00.

For the deconstruction work [which Harrington testified was worth $3,000] ... I find that ... the value of that work was $2,000.

For laying the sub floors in the kitchen and the bathroom, much of which was—was ultimately used by the—by Sifax, and for putting up framing in the basement and on the second floor, for repairing joists, and for pointing bricks both inside and outside, and then for priming the painting the exterior of the house, [which Harrington testified was worth $15,000–$20,000] I find that all of that work was worth $8,000.00.

For installing the two windows ... [which Harrington testified was worth $1,000] I find that that work was worth $1,000.00.

And finally for the purchase of the Jacuzzi, the oven, the three sinks and the front door ... items that [Trotman] testified in his memory cost a total of approximately $6,000.00. And that [Harrington] testified in her memory also without receipts or any other documentary evidence cost a total of $10,000.00. I find that the value of those items in total was $8,000.00.

The sum of the dollar amounts that the trial court ascribed to Harrington's work came to $39,000, compared to the $56,320 she received in the three draws approved by the housing inspector. The trial court found that Trotman was entitled to damages in the amount of $17,320 in restitution because he had paid Harrington more than the value of the work she performed, and Harrington had therefore been "unjustly enriched."

■ While we do not doubt the common sense appeal of the trial court's "splitting the baby" approach in terms of calculating the value of the work performed, we cannot sustain the award of damages to Trotman because the court fundamentally erred as a matter of law in finding unjust enrichment when there was a valid contract between the parties.

The modern law of unjust enrichment and restitution has its roots in the common law concept of quasi-contract. At common law there were cases in which the courts, *in the absence of an actual contract,* nevertheless imposed a duty ... under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.... Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another.... [Restitution by finding unjust enrichment] is an obligation which the law creates, *in the absence of any agreement,* when and because of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it....

*Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.,* 870 A.2d 58, 63–64 (D.C.2005) (emphasis added) (quotations and citations omitted); *see also Schiff v. American Ass'n of Retired Persons,* 697 A.2d 1193, 1194 (D.C.1997) ("[T]here can be no claim for unjust enrichment when an express contract exists between the parties."); *Emerine v. Yancey,* 680 A.2d 1380, 1384 (D.C.1996) (noting "the well-established proposition that where the parties

have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties"); *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C.1992) ("From the beginning a quasi-contract has been openly acknowledged to be a '[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases *where, in fact, there is no contract . . . .*'") (emphasis added) (alteration in original).

■ Here, there was—as the trial court recognized—a written contract between Harrington and Trotman. That contract provided that in exchange for Harrington's renovation work (which was described in detail), Trotman would compensate her for a sum certain ($88,000), with the possibility of adjustment if there were unforeseen difficulties, and "depending on finishes and fixtures chosen by homeowner." The contract required a deposit of 10% of the contract price ($8,800), with the remaining balance divided into five payments to be withdrawn from the bank with the home inspector's approval, "as required for expeditious completion." Trotman testified that Harrington would make a request for payment, and he would call the home inspector, who would in turn inspect the house and approve the draw from the bank which had lent money to Trotman.[5] It was undisputed that, in accordance with this procedure, three payments totaling $56,320 were made before Trotman decided to terminate the contract.

It was Harrington's defense that she was entitled to the money drawn because it had been approved by the inspector, as called for in the contract. According to Trotman, "the only reason that funds were released is that Ms. Harrington continually stated that she needed more funds to get the job going properly. That's the only reason I did that. So she could hire subs, give them money and move the job along, you know, in an efficient manner." As the payments were made for "expeditious completion," and were processed in accordance with the contract, Trotman cannot now claim, absent fraud,[6] that the terms of the contract he signed were unfair. *See Jordan Keys & Jessamy, LLP*, 870 A.2d at 64 ("One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement.").

■ Unless there is a basis to set aside a contract as unenforceable (i.e., "because of [the claimant's] own breach . . ., as a result of impracticability of performance or frustration of purpose . . ., under the Statute of Frauds . . ., or in consequence of the other party's avoidance for some reason as misrepresentation, duress, mistake or incapacity," RESTATEMENT (SECOND) OF CONTRACTS § 344 cmt. d (1981)), a court is not at liberty to grant equitable relief. *See Tough v. Netsch*, 83 N.H. 374, 142 A. 702, 705 (1928) (stating that claimant sought "to enforce his legal rights under a valid contract which equity cannot control or set aside."). We are aware that we have, in certain instances where the parties had a contract, allowed recovery under a theory of unjust enrichment or restitution when the claimant suffered from the *other* party's breach of the contract. *See Lee v. Foote*, 481 A.2d 484, 485 (D.C.1984) (per curiam) ("When an express contract has

---

5. The inspector acted as the bank's agent in determining whether the borrower was entitled to the money by inspecting the work in progress.

6. As noted, the trial court rejected Trotman's claims of fraud and conversion. See note 1, *supra.*

been repudiated or materially breached by the defendant, restitution for the value of the non-breaching party's performance is available as an alternative to an action for damages on the contract."); *Ingber v. Ross*, 479 A.2d 1256, 1263 (D.C.1984) (allowing restitution when ordinary relief for breach of contract is not adequate, and remedies are not cumulative to provide double recovery); *see also International Tours & Travel, Inc. v. Khalil*, 491 A.2d 1149, 1155 (D.C.1985) ("The equitable doctrine of unclean hands only applies where there is misconduct by the plaintiff in the same transaction that is the subject of his claim."). This principle affords Trotman no relief, however, because the trial court found no breach on the part of Harrington, but, rather, determined that it was Trotman who had breached the contract:

> [T]he contract makes clear that the contract price is to be flexible. That is that it is to increase or go up in the event of the selection of more expensive fixtures or finishes by the plaintiff. In the event of demolition work that proves more costly. For example, as the result of double walls or other complication. And also in the event of changes in the scope of the work.
>
> In this regard the evidence has established and I find that [Trotman] did change the scope of the work. Indeed it's undisputed that he did. At a minimum he added another bathroom to the scope of the work which is obviously not an insignificant change.
>
> It also—I also find based on the evidence that the demolition work was more costly than expected. In part because of the discovery of double walls.

At least in part of the house. And I find that [Harrington] did work that was outside the scope of the contract—at the request of [Trotman] . . . to include work on the roof, work pointing bricks, et cetera. But that notwithstanding all of this [Trotman] refused to increase the price of the contract or increase the amount of money that [Harrington] was to be paid under the contract.

In my view . . . [Trotman's] refusal to increase the amount of money that [Harrington] was to be paid under the contract itself constituted a breach of the— of the language of the contract.[7]

As Trotman breached the contract, and was not himself entitled to contract damages, he cannot avoid the bargain he made and claim recovery under a theory of unjust enrichment.

For the foregoing reasons, we reverse the judgment awarding damages to appellee on a theory of unjust enrichment, and remand with instructions to enter judgment for appellant.

*So ordered.*

---

7. We find it difficult to reconcile the trial court's finding, on the one hand, that Trotman had breached the contract by "refus[ing] to increase the price" in order to take into account additional work that Harrington performed, as required by the contract—in other words, that the money Trotman was to pay Harrington was insufficient—but, on the other hand, that the same amount of money was somehow too much for the work performed, and should be returned.