**Sohair YOUSSEF, Appellant,**

v.

**3636 CORPORATION and Jonathan Woodner Corporation, Appellees.**

**No. 97–CV–837.**

District of Columbia Court of Appeals.

Argued June 15, 1998.

Decided July 26, 2001.

---

Charles C. Parsons, Washington, DC, for appellant.

Matthew G. Finnegan, with whom Christopher E. Hassell, Washington, DC, was on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

One cold February evening, appellant Sohair Youssef slipped and fell outside her apartment building on an entrance mat that had become partially covered with ice during a day of inclement weather. Mrs. Youssef sustained a serious injury to her shoulder that caused considerable pain and required surgical treatment. She brought suit against 3636 Corporation and Jonathan Woodner Company, the building's owner and manager, respectively, seeking to recover damages under a theory of negligence. At the close of Mrs. Youssef's case, the court granted the defendants' motion for judgment as a matter of law on the ground that Mrs. Youssef had failed to establish that the defendants owed her a duty of care. We reverse.

I

In February 1993 Mrs. Youssef and her husband lived in the Woodner Apartments at 3636 Sixteenth Street, N.W. The twelve-story building contains approximately 1,100 residential units, and its lobby houses several retail shops, including a beauty salon, a health club, a restaurant, and a small grocery store. On the day of Mrs. Youssef's injury, the entrance area outside the front door was covered by a canopy, and on the ground beneath the canopy was a slip-resistant mat.[1]

On the evening of February 26, Mrs. Youssef and her husband went out at 5:00 p.m. and returned home around 9:30 p.m. When they left their apartment, it was snowing lightly, but no snow had yet accumulated on the walkways, though there was some slush in the driveway leading to the entrance of the building. When they returned, it was still snowing.[2] The sidewalk by this time was covered with snow, so the Youssefs walked in the driveway, which was "slushy" because of the vehicle traffic. As they approached the entrance to the building, Mrs. Youssef stepped onto the curb and scraped the snow from her shoes. When she looked at the mat near

1. The record does not reveal what the mat was made of.

2. Mrs. Youssef offered in evidence certified weather reports stating that the temperature in Washington on February 26, 1993, averaged 27 degrees, with a high of 29 and low of 25. The reports also showed that there had been falling snow or snow flurries from 1:00 a.m. until 10:00 p.m.

the entrance, it "looked clear ... and safe." As she stepped onto the mat, however, her foot slipped, and she fell backwards to the ground, reaching out with her left hand to break the fall. While she was still on the ground, both Mrs. Youssef and her husband inspected the mat. They saw a thin film of ice—"less than half a centimeter"—on the mat, covering an area approximately eighteen inches in diameter.

Denise Hale, a security guard employed by the Jonathan Woodner Company, which managed the building, saw Mrs. Youssef's fall through the glass entrance doors and promptly went outside to offer assistance. Ms. Hale did not touch the mat, but she saw that it was wet. Ms. Hale helped Mrs. Youssef to a chair in the lobby and said, "I'm sorry for that. We have a short crew today." [3] Because Mrs. Youssef was in a lot of pain, Ms. Hale summoned an ambulance, which took Mrs. Youssef to Georgetown University Hospital.

Ms. Hale was stationed at the security desk in the front lobby of the building from 3:00 p.m. to 11:00 p.m. At trial she did not recall whether any members of the grounds crew had sanded or salted the entrance during her shift that night. She testified, however, that she had been instructed by her supervisor to keep the front entrance to the building, including the mat under the canopy, clear of any hazards such as snow, ice, or spilled drinks. If she saw any dangerous condition, she was obliged to call the grounds crew and ask them to come and take care of it. On February 26 no such condition was called to her attention, and, except for Mrs. Youssef, she did not see anyone slip or fall outside the entrance.

Earl Jones, Jr., director of security at the Woodner at the time of Mrs. Youssef's fall, testified that the Woodner "sets a very high standard for keeping the property free of dangers, hazards, and risks ... [and] places a high premium on safety on its premises." [4] The grounds crew was responsible for maintaining the entrance to the building, including sweeping, washing, and de-icing the walkway. He testified that the security guard stationed in the lobby was responsible for notifying the grounds crew of any potentially unsafe condition. In addition, the Woodner had contracted with T.J. Snow Removal Company to provide service in the event that snowfall exceeded the ability of its grounds crew to keep the premises safe. The contract provided that if the snow accumulation exceeded two inches, T.J. Snow Removal would automatically come to clear the walkways and driveway, without being called by anyone at the Woodner.

Abel Nuñez, the grounds crew supervisor, testified that in his more than ten years of service at the Woodner, there had never been a complaint about his crew's snow removal work. Mr. Nuñez lived in the building at a reduced rent in exchange for being "on call" all the time. During inclement weather in the wintertime, Mr. Nuñez and his crew were responsible for inspecting the entranceway "every twenty minutes" for accumulated snow or ice. If there was any snow or ice present, he was

---

**3.** During the cross-examination of Ms. Hale, the defense introduced payroll records showing that four members of the building's grounds crew were on duty that night. Earl Jones later testified that four people was a normal complement.

**4.** At this point in Mr. Jones' testimony, the court interjected and instructed the jury that "the law doesn't demand premium standards; the law just requires what is reasonable under the circumstances." As we shall show momentarily, this was a correct statement of the law.

required to have it removed and to have the area treated with sand and salt.[5]

Dr. Talaat Maximous, an orthopedic surgeon, examined Mrs. Youssef about two weeks after her injury. She told the doctor that she had fallen in front of her apartment building and complained of pain in her left shoulder. Since her x-rays revealed no dislocation or fracture, he prescribed anti-inflammatory medicine. When Dr. Maximous saw Mrs. Youssef again in July, however, she was still suffering a great deal of discomfort. A magnetic resonance imaging (MRI) examination revealed a torn rotator cuff in her left shoulder which needed to be surgically repaired. Dr. Maximous performed such surgery in November 1993, but Mrs. Youssef continued to suffer sustained pain, so after two post-operative examinations the doctor referred her to a physical therapist. Dr. Maximous further testified about the different medicines Mrs. Youssef had to take and said that, up to the time of trial in April 1997, Mrs. Youssef continued to suffer pain and was limited in her activities.

At the close of Mrs. Youssef's case, defense counsel moved for judgment as a matter of law, contending that she had failed to establish that the defendants had either actual or constructive notice of a patch of ice on the mat. Counsel also argued that under *Croce v. Hall,* 657 A.2d 307 (D.C.1995), the mere existence of snow and ice does not create liability. Mrs. Youssef's counsel, arguing in opposition, emphasized that there was a security guard stationed in the lobby just inside the entrance, and that during inclement weather the guard had a duty to summon the grounds crew to clear and salt the walkway.

Following counsel's arguments, the court granted judgment for the defendants, reasoning as follows:

> ... I think the *Croce* case requires that judgment as a matter of law be granted to the defendants.
>
> First of all, at the time of the accident in question it was still snowing. That's the testimony of both Mrs. Youssef and her husband. And essentially the *Croce* case, first of all, says that a landlord without actual knowledge of the existence of dangerous conditions ordinarily has a reasonable time after the conclusion of the storm to remove any hazardous accumulation of snow and ice.
>
> Again, on page 311 the *Croce* case quotes favorably from a case in Indiana. It says, "A landlord had no duty to remove the ice during the time moisture was falling and freezing on the ground."
>
> So first of all, under the *Croce* case, there was no duty on the landlord's part, on the defendant's part, to take any action, any remedial measures during the time the snow was falling.
>
> Secondly, there was no evidence whatsoever that the defendant had actual notice of any icy or hazardous conditions on the mat with respect to any constructive notice.
>
> Again, under *Croce* there was no requirement for the landlord to start removing anything, and secondly, neither Mrs. Youssef nor Mr. Youssef noticed anything when they were on the mat, when they were walking across the mat.
>
> And the only time that this very thin patch of ice was even found was when Mr. and Mrs. Youssef actually touched it.

---

**5.** Although there were two grounds crew shifts, from 7:00 a.m. to 3:00 p.m. and from 1:00 p.m. to 9:00 p.m., several members of the crew lived in the building and were on call at all times to deal with emergency conditions.

So in terms of its visibility, in terms of any sort of constructive notice, I don't think a case has been made.

I know Mrs. Youssef has been hurt. I believe that she has suffered her injuries. Under the law of the District of Columbia, the landlord is not an insurer, a property owner is not an insurer, and I am granting judgment as a matter of law to the defendant[s].

## II

■■■ On review of an order granting a motion for directed verdict (or its current equivalent, judgment as a matter of law), we apply the same standard as the trial court. *E.g., Robinson v. Group Health Ass'n*, 691 A.2d 1147, 1150 (D.C.1997). When the evidence and its attendant inferences, viewed in the light most favorable to the non-moving party, support but one reasonable conclusion favorable to the moving party, the court must grant the motion; otherwise, however, the motion must be denied. *See Pazmino v. Washington Metropolitan Area Transit Authority*, 638 A.2d 677, 678 (D.C.1994); *Washington Metropolitan Area Transit Authority v. Jones*, 443 A.2d 45, 50 (D.C. 1982) (en banc); *see also* Super. Ct. Civ. R. 50(a).

■■■ Generally, in order to prevail on a claim of negligence, the plaintiff must establish a duty of care, a deviation from that duty, and a causal relationship between that deviation and an injury sustained by the plaintiff. *E.g., District of Columbia v. Shannon*, 696 A.2d 1359, 1365 (D.C.1997); *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988). Consequently, a defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care. *Kerrigan v.*

*Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C.1997) (citing cases); *see also N.O.L. v. District of Columbia*, 674 A.2d 498, 499 n. 2 (D.C.1995) ("The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff") (citing *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928)). "In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care under all of the circumstances." *Sandoe v. Lefta Associates*, 559 A.2d 732, 738 (D.C.1988) (citations omitted); *accord, e.g., Traudt v. Potomac Electric Power Co.*, 692 A.2d 1326, 1333 (D.C.1997); *Levine v. Katz*, 132 U.S.App. D.C. 173, 174, 407 F.2d 303, 304 (1968).

Since the trial court expressly relied on *Croce v. Hall* in rendering its decision, we take a moment to discuss the facts of that case. At about 8:50 a.m. on March 7, plaintiff Croce slipped and fell on a walkway that was lightly covered with snow and ice in front of the defendant's building. The plaintiff sustained injuries and filed suit. When the defendant moved for summary judgment, the plaintiff filed an opposition, attaching certified copies of weather reports from the Weather Bureau and weather reports published in the Washington Post for March 6 and 7. These reports showed that snow and ice were predicted throughout both days and that accumulations of one to two inches of snow were expected for March 7; the chance of precipitation for the overnight period was predicted to be "near 100 percent." [6]

The trial court granted the defendant's motion for summary judgment. On appeal, Croce did not argue that the defendant had actual notice of a hazardous

---

**6.** These predictions proved to be incorrect because, as late as 5:30 p.m. on March 6, there had been no precipitation that day. *Croce,* 657 A.2d at 309 n. 4.

condition; rather, relying on the weather reports, she asserted that he had constructive notice. Croce maintained that the building owner "had an obligation to monitor the weather reports in order to keep himself apprised of any potentially dangerous weather conditions." 657 A.2d at 311. In affirming the grant of summary judgment, this court expressly rejected that argument and held that "the concept of constructive notice [cannot] be extended to impose upon landlords an ongoing duty to monitor weather reports, to keep themselves apprised of changing weather predictions, and to rectify immediately any potentially dangerous accumulations of snow and ice."[7] Id. at 312 (footnote omitted).

■ The court's holding in Croce did not establish any new rule of law. Instead, the court merely articulated a rule of evidence that weather predictions alone are not sufficient to establish constructive notice of an allegedly dangerous condition. Thus, despite the assertions of both parties, the holding of Croce v. Hall is not dispositive of the case at bar. More pertinent are two cases from the United States Court of Appeals for the District of Columbia Circuit: Pessagno v. Euclid Investment Co., 72 App. D.C. 141, 112 F.2d 577 (1940), and Harris v. H.G. Smithy Co., 139 U.S.App. D.C. 65, 429 F.2d 744 (1970).[8] We shall consider Harris in a moment, but first we turn to Pessagno.

■ The plaintiff in Pessagno was injured when she fell on an icy driveway in front of an apartment building as she was walking from the front door to a waiting taxicab. "The day was cold and rainy, and the driveway and streets were slippery and dangerous from ice forming as the rain fell." However, although "it was still raining and freezing, [the plaintiff testified that she] observed that there was neither sand nor ashes upon the steps or driveway." 72 App. D.C. at 142, 112 F.2d at 578. The court framed the issue as follows:

> Is a landlord, who rents apartments in his building to various tenants and reserves control of the common approaches, obligated to use reasonable care, during the progress of a storm, to remove or render harmless ice forming thereon from natural causes?

Id. (emphasis added). Rejecting a rule adopted by the courts of Massachusetts[9] and New York[10] under which a landlord or landowner had no such duty, the court held that the owner of an apartment building had an obligation

> not only to exercise ordinary care to construct the approaches and other parts of the building under his exclusive control so that they will be reasonably safe, but likewise, after notice, to exercise ordinary care to keep them free from conditions, whether permanent or temporary, which make them dangerous to the tenants or their guests.

Id. at 143, 112 F.2d at 579 (citing Wardman v. Hanlon, 52 App. D.C. 14, 17, 280 F. 988, 991 (1922)). Accordingly, the court ruled that if a landlord knows, or in the

---

7. Mrs. Youssef asserts that this pronouncement has no bearing on this case because, unlike the walkway in the instant case, the walkway in Croce was "uncovered." We find this difference between Croce and this case to be of no significance.

8. Both Pessagno and Harris are binding on this court under M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C.1971).

9. Bell v. Siegel, 242 Mass. 380, 136 N.E. 109 (1922).

10. Kelley v. Manhattan Ry., 112 N.Y. 443, 20 N.E. 383 (1889).

exercise of ordinary care should know, of a dangerous condition in a common area caused by accumulated—or accumulating—snow or ice, that landlord has a duty "to exercise the degree of care which an ordinarily prudent person, *in view of existing circumstances*, would ... exercise[ ] to avoid injury to a person lawfully using it...." 72 App. D.C. at 143, 112 F.2d at 579 (emphasis added). Since there was conflicting evidence as to the presence or absence of sand on the walkway,[11] the court held that the question "whether, in these circumstances, what was done was reasonable care" was a question for the jury under proper instructions. *Id.*[12]

■■■ The law also requires, however, that the landlord have notice, actual or constructive, of a hazardous condition; without such notice, the landlord is not liable for any resulting injuries. *Croce*, 657 A.2d at 310 (citing *Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C.1982)). Thus "[t]he mere presence of snow and ice does not impose an obligation upon the landlord to remove it—rather, the landlord is responsible for removing in a reasonable amount of time only those accumulations which he knew or should have known were dangerous." *Id.* (citing *Langley Park Apts. v. Lund,* 234 Md. 402, 410, 199 A.2d 620, 624 (1964)). Moreover, "a landlord *without actual knowledge* of the existence of a dangerous condition ordinarily has a reasonable time after the conclusion of a storm to remove any hazardous accumulations of snow and ice." *Id.* at 311 (emphasis added) (citing *Battle v. George Wash-*

*ington University,* 871 F.Supp. 1459, 1462 (D.D.C.1994) (footnotes and other citations omitted)). But this does not mean, as the trial court mistakenly believed, that a landlord *with* notice—actual or constructive—of such "hazardous accumulations" may wait until the snow stops falling before taking any steps to remove it. *Pessagno,* in particular, teaches otherwise: that a landlord, "after notice," has a duty "to exercise ordinary care to keep [his property] free from [dangerous] conditions,"[13] even "during the progress of a storm."[14] *Croce* does not hold otherwise, and the trial court erred in concluding that it did.

■■■ This appeal turns not on whether appellees owed Mrs. Youssef a duty or on what that duty was, but on whether appellees were on notice of a hazardous condition that required their prompt attention. On this question the *Harris* case is very helpful. *Harris,* like this case, involved a tenant who was injured when she slipped and fell in a common area of her apartment building. The evidence showed "that at the time of the accident, rain was falling and the lobby floor was wet." *Harris,* 139 U.S.App. D.C. at 66, 429 F.2d at 745. There was also evidence that it had been raining for several hours, but apparently no one else had fallen on the wet floor. The trial court, sitting without a jury, dismissed the action at the close of the plaintiff's case on the ground "that the landlord had neither actual nor constructive notice of the wet and slippery condition of the floor, and hence had no duty to take cor-

---

11. There was testimony that the superintendent of the building "had the icy places sanded on four different occasions" throughout the day, from 6:00 a.m. to 5:00 p.m., but the plaintiff said she saw no sand when she fell at 9:30 p.m. *Pessagno,* 72 App. D.C. at 143, 112 F.2d at 579.

12. More recently, in *Croce v. Hall,* this court reiterated "that the landlord's duty to prevent

dangerous accumulations of snow and ice is one of ordinary care under the circumstances." 657 A.2d at 310 (citations and footnote omitted).

13. *Pessagno,* 72 App. D.C. at 143, 112 F.2d at 579.

14. *Id.* at 142, 112 F.2d at 578.

rective action." *Id.* The Court of Appeals reversed and remanded for a new trial, stating:

> [E]vidence of a substantial period of rain is sufficient to give a landlord constructive notice of the foreseeable hazards that may result from that rain, including the risk that water will be tracked into an apartment lobby and the floor will become slippery.

*Id.* (citation omitted). Observing that "modern apartment dwellers" may reasonably expect "a well-known package of goods and services, [including] proper maintenance," the court held:

> Minimal standards of proper maintenance require the landlord to anticipate dangerous conditions that recur regularly, and to take some precautions.
>
> If rain and the normal traffic of tenants regularly result in a slippery lobby floor, then a landlord cannot wait each time it rains for notice that the floor is wet.... It is sufficient to show notice of rain, combined with the probability that in rainy weather tenants will track in water and the lobby floor will become slippery.

*Id.* at 67, 429 F.2d at 746 (citations omitted). On the key issue of notice, the court held that the case "turn[ed], in part ... on the question whether rain had been falling for a sufficient period of time before the accident to give the landlord constructive notice of the danger of a slippery lobby floor." *Id.*

Applying the reasoning of *Harris* to the matter before us, we conclude that the trial court erred in directing a verdict for appellees at the close of the plaintiff's case. Under *Harris,* appellees as landlords were obliged to "anticipate dangerous conditions that recur regularly," *e.g.,* a slippery walkway when snow falls in sub-freezing weather. The evidence showed that snow had been falling off and on for more than twenty hours (see note 2, *supra*), enough time for appellees to take precautionary measures. Therefore, even if the owner and manager of the building did not actually know of the danger, a jury, properly instructed in accordance with *Harris,* could find that they reasonably should have known about it, and thus that they had a duty to act with reasonable care under the circumstances. *Croce,* 657 A.2d at 310; *Pessagno,* 72 App. D.C. at 142–143, 112 F.2d at 578–579. Mrs. Youssef's evidence raised two issues that the jury should have been allowed to decide: "(1) whether there was a sufficient period of [snowfall] to provide constructive notice of the danger of a slippery [walkway], and (2) if so, whether appellees exercised reasonable care in responding to that danger." *Harris,* 139 U.S.App. D.C. at 67, 429 F.2d at 746.

The judgment is accordingly reversed, and the case is remanded for a new trial.

*Reversed and remanded.*