**CB RICHARD ELLIS REAL ESTATE SERVICES, INC., Appellant,**

v.

**Christian J. SPITZ, et al., Appellees.**

**No. 04–CV–1322.**

District of Columbia Court of Appeals.

Argued May 9, 2006.

Decided June 19, 2008.

---

25. Counts II and III of William's counterclaim no longer appear to be at issue.

Paul T. Hourihan, with whom Paul Martin Wolff and Joseph E. Fluet III were on the brief, for appellant.

S. Scott Morrison, with whom Nicole Lynn Kobrine was on the brief, for appellees.

Before GLICKMAN, KRAMER, and FISHER, Associate Judges.

FISHER, Associate Judge:

The central issue in this appeal is whether CB Richard Ellis Real Estate Services, Inc., is precluded from recovering any fees for services rendered to appellees in connection with a complex real estate transaction. Holding that D.C.Code § 42–1705 (2001) barred any recovery in contract, quasi-contract, or tort because there was no written listing agreement for sale of the property,[1] the Superior Court granted summary judgment in favor of defendants/appellees. We conclude that there are genuine issues of material fact and remand for further proceedings consistent with this opinion.

## I. Factual Background[2]

Appellant CB Richard Ellis Real Estate Services, Inc., formerly known as Insignia/ESG, Inc., is a commercial real estate services company operating in the District of Columbia and elsewhere. Appellant represents that its Washington office "specializes in procuring debt and equity financing for commercial real estate projects." Appellees are individual real estate developers and their respective limited liability companies. The three primary developers, Christian Spitz, Walter Rector, and Fred Merrill, Jr., formed 1899 Pennsylvania Avenue, LLC ("1899 LLC") for the purpose of acquiring and redeveloping the office building located at 1899 Pennsylvania Avenue, N.W. (the "Property"). In this opinion, we will refer to appellant as "Insignia" and to appellees as "1899 LLC," the "Developers," or, when appropriate, by their individual names.

### A. The Goal of Replacing Expensive Debt

In January 2001, Insignia brokered the purchase of the Property, acting on behalf of 1899 LLC.[3] Throughout 2001 and 2002, the Developers successfully renovated the Property into an upscale office building and secured tenants. However, the purchase and renovations left significant expensive debt which the Developers sought to replace through refinancing or recapitalization. In the fall of 2002, the Developers asked Insignia to assist them in this effort. According to Insignia, the Developers explicitly stated that they did not want to sell the Property because they hoped to continue earning income and fees from it and to avoid paying capital gains tax.

Turning to the task, Insignia began gathering market and project information to present in an Offering Memorandum that would be used to attract potential investors or lenders. Insignia completed an "initial draft" of the Offering Memorandum near the end of 2002. In essence, this draft was an informal compilation of the "nuts and bolts," including the "financial analysis" and the "sale and lease comps," that outlined the "financial picture for the property." Sometime in December 2002 or January 2003 Insignia paused in

---

1. D.C.Code § 42–1705 provides in its entirety: "A written listing contract is required in the District for the sale of all real property. A licensee shall not receive payment of a commission in the absence of a written listing agreement."

2. Because we are reviewing a grant of summary judgment, we "look[ ] at the evidence in the light most favorable to the non-moving party...." *Linen v. Lanford,* 945 A.2d 1173, 1177 (D.C.2008).

3. 1899 LLC is controlled by Christian Spitz and Walter Rector.

its work while the Developers negotiated a lease with Wilmer, Cutler & Pickering.

Around January 2003, Insignia resumed work on the Offering Memorandum. At this point, a "complete revision" of the initial draft was "necessary" and Insignia went to work revising, updating, and changing entire sections. Specifically, the sponsorship and financial sections were "completely redone" and a "large portion of the executive summary" was changed. Meanwhile, Insignia continued to "run[ ] multiple financial scenarios for the 1899 group, Mr. Rector specifically, to show them possible ... financing scenarios." This work was performed from January to April 2003. Although it is unclear when Insignia officially completed the Offering Memorandum, it did e-mail Rector a nearly final version on March 3, 2003. The various versions of the Offering Memorandum, prepared by Insignia and approved by the Developers, expressly contemplated recapitalization or refinancing, not a sale of the Property.

## B. Did the Parties Reach an Agreement?

Meanwhile, the Developers and Insignia began negotiating the terms of an agreement that would govern their relationship. The first draft of the engagement letter is dated October 17, 2002. This draft discusses a "recapitalization" but does not mention a "sale." Throughout October 2002, the parties exchanged drafts of this engagement letter. Although each sequential draft contains changes, the fundamental purpose of the collaboration—to achieve "recapitalization" of the Property—seems to remain the same.

Insignia and the Developers met again on January 7, 2003, "to reach agreement on the terms and conditions of [Insignia's] engagement with 1899[LLC]." According to Insignia, Rector "conduct[ed] the discussion on behalf of [1899 LLC]" and the parties reached an agreement on the terms dealing with "any carve-outs," "the services provided," "the fees associated with those services," "the duration of the agreement," and "compensation." By the conclusion of the meeting, "everybody said that we are satisfied with those fee amounts and that the next step would be to put it into a document." Insignia claims that these terms "were memorialized in the agreement that was executed by Walt Rector."

During early February 2003, the parties exchanged different versions of the draft engagement letter. The version at issue here is dated February 13, 2003, and was transmitted by Insignia to the Developers on February 20, 2003 (the "February 20th Letter"). Under its terms, the Developers would "exclusively engage[ ] Insignia to identify, structure and negotiate the recapitalization of the above-referenced Property." Insignia would "promptly commence and diligently prosecute obtaining required financing...." The letter mentioned a permanent loan, mezzanine financing, or joint venture equity as potential options, and 1899 LLC would "authorize[ ] Insignia to offer the Property for such financing[.]" It also included a formula for paying Insignia "for all efforts, including all analysis, recommendations, marketing support and any other required consultation by Insignia professionals ... [provided] financing is obtained...." [4] On the other hand, "[i]f [1899 LLC] chooses not to enter into an

---

4. Insignia agreed not to approach Noro Funds or Mutual of New York ("MONY") "as a potential equity or mezzanine source ...," and seemingly contradictory language provided that Insignia would receive limited fees, or perhaps no fees, if either group provided financing. The parties seem to agree that the February 20th Letter "carved out" Noro and MONY.

Agreement for the refinancing of the Property, [1899 LLC] will not owe Insignia any compensation whatsoever for our services hereunder."

The February 20th Letter did not mention a sale of the property. In fact, the words "purchase," "sale," "buyer," and "seller" do not appear in any portion of the letter. Although Spitz and Insignia had discussed a group known as WestWind[5] a week earlier, the February 20th Letter did not list WestWind as a "carve-out" from the formula for compensating Insignia.[6] Rather, the letter was silent with regard to any potential transaction with WestWind.

 The parties dispute whether they agreed to the terms of the February 20th Letter. Insignia never signed the document, but claims to have advised the Developers that it "fully agreed and assented to the terms set forth [therein]" when it e-mailed the letter to them on February 20, 2003. Although Rector signed the letter and faxed it back to Insignia on that same day, he stated in a cover memo that "[m]y execution and delivery to you is contingent upon your receipt of this engagement letter signed by [Spitz]." Rector concluded his cover memo with the exhortation, "Let's go get this job done." Insignia claims that Spitz orally acknowledged that the parties had reached an agreement on multiple occasions between February 20th and March 5th, but concedes that he never actually signed the February 20th Letter.[7]

## C. What About WestWind?

On either March 4th or March 5th, Spitz telephoned Insignia to discuss the fact that he expected to receive a proposal from WestWind.[8] According to Insignia, Spitz "indicated ... that he wanted to discuss our fee as related to WestWind" and "suggest[ed] that he was going to break our contract." In response, and "in anticipation of him breaking our contract," Insignia suggested they could "somehow negotiate or compromise to a reduced fee in order to make the transaction fly with WestWind." It appears that both parties agreed to "think" about a possible compromise but that none was reached at that time.

However, on March 5, 2003, Spitz sent a new version of the engagement letter to Insignia (the "March 5th Letter"). The Developers cite this response as evidence that no agreement had been reached; Insignia maintains that Spitz was simply attempting to modify the terms of their previous agreement. The two letters are largely the same, but the March 5th Letter attempted to "carve out" WestWind, and thus to limit Insignia's compensation in a manner central to this dispute. It stated

5. We use the term "WestWind" to refer collectively to WestWind Capital Partners, L.P. and Kan Am Grund.

6. Over dinner on February 12, 2003, Spitz informed Insignia of his "relationship with WestWind that had originated from a prior transaction[.]" At that time they discussed WestWind, but did not reach an agreement on Insignia's compensation for a WestWind transaction.

7. The Developers urge us to disregard the affidavit of Paul Dougherty, submitted in opposition to their motion for summary judgment, contending that it is a "sham affidavit."

However, they have not demonstrated a sufficiently "clear and explicit contradiction between what [was] said at the deposition and what is said in the [subsequent] affidavit[,]" *Hinch v. Lucy Webb Hayes National Training School*, 814 A.2d 926, 931 (D.C.2003), to justify invoking that doctrine.

8. According to Paul Dougherty, Insignia's representative, "we had known all along that WestWind was going to be providing a proposal." He explained that Spitz provided Insignia with contact information for WestWind "back in the fall."

that, "[s]hould Owner complete a transaction with WestWind, Insignia will not be due a fee but will be reimbursed for its time in preparing the Offering Memorandum and all reasonable out of pocket third party costs." In addition, this version of the letter now explicitly referenced a "sale" to WestWind as a potential outcome.[9]

Insignia asserts that it assumed Spitz's March 5th Letter was a signed and executed copy of Insignia's February 20th Letter, and filed it away without reading Spitz's substantive changes.[10] The next day, March 6, 2003, Insignia replied to Spitz's e-mail, not realizing that he had changed the letter, and suggested a compromise for the WestWind situation.[11] Insignia wrote: "We need to get a break-up fee if [WestWind] does the deal. How about 1 point on the equity." It appears that Spitz did not respond to this e-mail and it was not until April 9, 2003, when Insignia reviewed the compensation terms in the March 5th Letter and WestWind's Letter of Intent, that the issue resurfaced.

On April 9, 2003, Insignia e-mailed Spitz complaining that the compensation terms listed in some of the documents were inconsistent with their "verbal agreement as it relates to Westwind." This new development led to further exchanges about how 1899 LLC would compensate Insignia should a transaction with WestWind occur. The various terms discussed included a one percent fee, a $200,000 fee, or simply a reimbursement of expenses. The parties dispute whether they ever reached an agreement on that issue.

The parties also dispute whether the Developers used the Offering Memorandum in their solicitation of and negotiations with WestWind. The record suggests, however, that during March and April 2003, the Developers sent WestWind electronic copies of the Offering Memorandum and brought hard copies of it to a meeting with WestWind in Austria. In addition, when presented with multiple copies of the Offering Memorandum during his deposition, WestWind's Stephen McCarthy identified his handwriting on some and testified that others came from WestWind files.

### D. The Transaction

In July 2003, 1899 LLC consummated a deal with WestWind which included deeding the debt-encumbered Property to a previously-formed limited partnership called Kan Am 1899 Pennsylvania Avenue LP ("Kan Am 1899"). As part of the transaction, 1899 LLC was admitted to the partnership, which now consisted of one general partner, WestWind 1899 Pennsylvania Avenue Management, LP, holding a 0.01% equity share, and two limited partners, Kan Am Grund and 1899 LLC, holding equity shares of 94.99% and 5.00%, respectively. In accordance with a Contri-

---

**9.** "Notwithstanding anything else in this agreement to the contrary, Insignia recognizes that Owner has presented the property for sale, joint venture equity financing and debt financing to WestWind."

**10.** When questioned about his failure to read the March 5th Letter, Paul Dougherty, Insignia's agent, explained that he received Spitz's e-mail, with the letter attached as a document, on his Blackberry. He stated that he could read the e-mail immediately but could not open, and thus could not read, the at-

tached letter on his Blackberry. He further explained that Spitz's e-mail "did not lead [him] to believe that [Spitz] made any modifications to the agreement" and thus he did not take the time to read the attachment later.

**11.** Dougherty explained that he "was just using [Spitz's] email to respond back, to reply to the email, not knowing what was in the agreement, the same way that you would pick up any email for ease of replying ... as opposed to typing their name in."

bution Agreement, Kan Am 1899 paid off the existing debt on the Property (approximately $70 million) with proceeds of a new loan and money contributed to the partnership by Kan Am Grund and the General Partner.

Article 10 of the Contribution Agreement, entitled "Brokerage Commissions," specifically identifies Insignia as the "Broker" for the transaction and recites:

> Insignia ESG ("Broker") has represented Current Owner [1899 LLC] in connection with the transactions contemplated by this Agreement. Upon the Closing, and only if the Closing occurs, the Partnership shall pay a brokerage fee of Two Hundred Thousand and No/100 Dollars ($200,000.00) to Broker; provided, however, Current Owner shall be responsible for any additional commission or fee, if any, due Broker.

Insignia is not a party to this agreement, but 1899 LLC is, and Article 10 seems to acknowledge that Insignia played an important role in arranging the transaction. Notwithstanding this acknowledgment, and despite the previous discussions regarding how Insignia would be compensated if a transaction with WestWind occurred, 1899 LLC now contends that it has no financial obligation to Insignia whatsoever.

## II. Procedural Background

On September 11, 2003, Insignia filed a complaint, later amended to allege thirteen counts sounding in contract, quasi-contract, and tort. The Developers moved for summary judgment, and on August 4, 2004, the trial court granted them judgment on all counts. The court held that (1) no enforceable written agreement exists between the parties, (2) the WestWind transaction constituted a "sale" of property governed by D.C.Code § 42–1705, and (3) the statute totally bars recovery of a bro-

kerage commission absent an enforceable written agreement. For these reasons, the court rejected Insignia's claim for breach of a written contract and its claims based on implied-in-fact or oral contracts, promissory estoppel, and unjust enrichment. The court dismissed Insignia's other claims for reasons we will explain later, as necessary. Insignia subsequently filed a motion to alter or amend the judgment, which the court denied without opinion on September 29, 2004. This timely appeal followed.

## III. Standard of Review

■ " 'Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law.' " *Blodgett v. University Club*, 930 A.2d 210, 217 (D.C.2007) (citation omitted); *see* Super. Ct. Civ. R. 56(c). " '[T]he judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Linen v. Lanford*, 945 A.2d 1173, 1179 (D.C.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Brown v. George Washington University*, 802 A.2d 382, 385 (D.C.2002) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

■ Whether summary judgment was properly granted is a question of law, and our review is therefore *de novo*. *Allman v. Snyder*, 888 A.2d 1161, 1165 (D.C.2005). "Although we must view the record in the light most favorable to the non-moving party, ... mere conclusory allegations are insufficient to avoid entry of summary

judgment." *Blodgett,* 930 A.2d at 217 (citations omitted).

## IV. Analysis

This case turns in large part on how we characterize the transfer of the Property from 1899 LLC to Kan Am 1899. The trial court concluded that the transfer was a sale and held that D.C.Code § 42–1705 completely bars all of Insignia's claims because there is no enforceable written listing agreement. The Developers support the trial court's analysis. Insignia argues that the transfer was not a sale, but rather a contribution of capital beyond the scope of § 42–1705. It also argues, alternatively, that the February 20th letter was a written listing agreement, to which the parties had orally agreed. In addition, Insignia challenges the trial court's holding that failure to comply with § 42–1705 bars all compensation, not just recovery of a commission on a sale.

In confronting these issues, we recognize that the parties' collaboration extended over many months, and, for much of that period, it seems that no one expected a sale to occur. We therefore must consider the entire scope of the parties' dealings and how their intentions evolved over a significant period of time.

With the benefit of hindsight, it surely would have been prudent for Insignia to obtain a commitment from the Developers in writing, but D.C.Code § 42–1705 applies only to a sale of real property. Perhaps, in the months before the Developers mentioned the possibility of a sale, the parties reached a binding agreement, oral or written, that Insignia would be compensated for its services supporting the Developers' quest for refinancing or recapitalization. Even in the absence of an agreement, Insignia might be entitled to claim compensation for the value of its services. It is not apparent at the outset that § 42–1705 extends so far as to preclude Insignia from recovering any compensation whatsoever, at least for the period before March 5th.

### A. Was This Transaction a Sale Governed by D.C.Code § 42–1705?

We turn first to the question of whether D.C.Code § 42–1705 governs all or any part of the transaction. To remind the reader, that statute provides: "A written listing contract is required in the District for the sale of all real property. A licensee shall not receive payment of a commission in the absence of a written listing agreement." The application of this statute to a particular transaction therefore depends on whether it is a "sale of ... real property." The statute does not define the term "sale," so we must look to our precedent for guidance.

In *West End Tenants Ass'n v. George Washington University,* 640 A.2d 718 (D.C.1994), we had occasion to interpret the term "sale," found in a different statute related to transfers of real estate. We concluded that "[t]here appears to be an almost universal consensus that, in the context of real property transactions, the word 'sale' signifies an absolute transfer of property." *Id.* at 727. We adopted the following definition of "sale": "[a] contract whereby property is transferred from one person to another for a consideration of value, implying the passing of the *general and absolute title, as distinguished from a special interest falling short of complete ownership.*" *Id.* at 727–28 (quoting BLACK'S LAW DICTIONARY 1337 (6th ed.1990) (emphasis in *West End Tenants* )).[12] This

---

12. We later emphasized that "[t]o be a 'sale' ... a property transaction must be an 'absolute transfer' or amount to the passing of 'general and absolute title.'" *Twin Towers*

definition, used in the context of real property transactions, did not depend on any peculiar wording of the statute at issue then. We see no reason why it should not apply to the statute before us now.[13]

■ The Developers assert, and we agree, that the Deed does, in fact, transfer "general and absolute title" from 1899 LLC to Kan Am 1899. We recognize that the entire transaction was far more complex than a typical sale of real estate. But focusing on the Contribution and Partnership Agreements, as Insignia urges us to do, does not change our conclusion. The Contribution Agreement requires 1899 LLC to "transfer, convey and contribute" the Property, in its entirety, to Kan Am 1899. Kan Am 1899 "agrees to accept and acquire the Property." The Partnership Agreement states that the "purpose of the Partnership" is to "acquire ... and hold" the Property; it recites that 1899 LLC has "conveyed and transferred" the Property to the partnership. Thus, these agreements support, rather than contradict, the Developers' argument that 1899 LLC transferred "general and absolute title" to Kan Am 1899.

In addition, the title was transferred "for a consideration of value." *See West End Tenants,* 640 A.2d at 727. Kan Am 1899 paid off 1899 LLC's significant debt on the Property (amounting to approximately $70 million) and 1899 LLC also received a 5% equity interest in Kan Am 1899. Relying on a definition of sale contained in a more recent edition of BLACK's LAW DICTIONARY[14] and another quoted in a Supreme Court decision, Insignia argues that "the *sine qua non* of a 'sale' is the contractual obligation to pay a price in money in exchange for the property to be conveyed." However, it is well-recognized that "consideration of value," the phrase used in *West End Tenants,* encompasses more than money delivered to the seller. *See, e.g., Columbia Realty Venture v. District of Columbia,* 433 A.2d 1075, 1077 (D.C.1981) ("It has long been recognized that the assumption of the debts of another will constitute consideration...."); *Commercial National Bank v. McCandlish,* 57 App. D.C. 378, 23 F.2d 986 (1928) (same). And the definition of "sale" we adopted in *West End Tenants* surely is more durable than the publishing cycle of BLACK's LAW DICTIONARY. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971) (a decision of one division of this court is binding on another division).

---

*Plaza Tenants Ass'n v. Capitol Park Assocs., L.P.,* 894 A.2d 1113, 1119 (D.C.2006) (quoting *West End Tenants,* 640 A.2d at 727). Furthermore, a transfer "of interests 'falling short of complete ownership' ... is not the same as transferring 'absolute title.' " *Id.* (quoting *West End Tenants,* 640 A.2d at 727–28).

13. After we decided *West End Tenants,* the Council of the District of Columbia amended the Tenant Opportunity To Purchase Act both to broaden the definitions of "sell" and "sale" and to exclude some sales from the statute's coverage. *See* D.C.Code § 42–3404.02 (Supp. 2007). The effect of certain amendments is to establish that something less than a complete transfer of general and absolute title may qualify as a sale. In some instances, a complete transfer of general and absolute title, for consideration, would not be a sale, but none of these restrictions would exclude the transaction at issue here. *See* D.C.Code § 42–3404.02(c)(2) (Supp.2007). Most importantly, these new definitions apply only to subchapters IV and V of Title 42, chapter 34. Thus, these legislative revisions to the definition adopted in *West End Tenants* do not affect the outcome here.

14. "Sale" is defined as: "1. The transfer of property or title for a price. 2. The agreement by which such a transfer takes place.—The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." BLACK's LAW DICTIONARY 1337 (7th ed.1999).

Finally, Insignia too narrowly reads the case on which it relies. Quoting from one of its earlier opinions, the Supreme Court said that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money *or its equivalent.*" *Comm'r v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (emphasis added; internal quotation marks and citation omitted).[15] Paying off the debt held by 1899 LLC (which, of course, could be quantified) was the *equivalent* of paying a fixed price in money, and the 5% equity interest had a value that could be, and was, calculated in dollars.[16]

Thus, the complete transfer of the Property, for consideration, from one entity to another, meets the definition of "sale" we adopted in *West End Tenants* and applied in *Twin Towers.* We recognize, and the Developers acknowledge, that 1899 LLC's receipt of "a five percent limited partnership interest" in Kan Am 1899 conceptually places it on both sides of the transaction. However, this does not serve to exclude the transaction from our definition of "sale." As a limited partner, 1899 LLC has an equity interest in Kan Am 1899; it has no ownership interest in the property owned by that entity.[17] Furthermore, 1899 LLC has no management control over the Property.[18] The transaction therefore occurred between two separate and distinct entities, and 1899 LLC transferred complete ownership from itself to Kan Am 1899.[19]

---

15. The Supreme Court did not need to decide whether the definition it quoted was comprehensive enough to include all sales because "[t]he transaction which occurred in [that] case was obviously a transfer of property for a fixed price payable in money." 380 U.S. at 571, 85 S.Ct. 1162.

16. The value of the equity interest received by 1899 LLC was fixed in Section 3.3(a) of the Partnership Agreement:

> As provided in the Contribution Agreement, the net fair market [sic] of the [Property] (after deducting the outstanding amounts due under the Development Loan and the South Charles Loan and other adjustments as described in the Contribution Agreement) is $2,199,644.05, which amount shall be credited to the Contribution Account and Capital Account of 1899 LLC. Such amount credited to the Contribution Account of 1899 LLC represents five percent (5%) of the aggregate sum of the Contribution Accounts of all Partners....

17. *See* D.C.Code § 33–102.03 (2001) ("Property acquired by a partnership is property of the partnership and not of the partners individually."); *see also Price v. District of Columbia Rental Housing Comm'n,* 512 A.2d 263, 268 (D.C.1986) ("'a partnership holds and conveys property separately and distinctly from the individuals who hold an interest in the partnership.'") (citations omitted).

18. Section 6.1 of the Partnership Agreement specifies:

> Except as otherwise provided herein, the Limited Partners shall not take part in the management or control of the Partnership's business nor shall they transact any business for the Partnership, nor shall they have the power to act for or bind the Partnership, said powers being vested solely and exclusively in the General Partner as set forth herein.... 1899 LLC shall have no approval or consent rights whatsoever under this Agreement.

> It appears that DRI Partners, Inc., another entity controlled by Spitz, was hired by Kan Am 1899 to manage the Property, but that company, of course, is distinct from 1899 LLC, and this arrangement does not undermine the conclusion that 1899 LLC has no management control over the Property.

19. The facts of this case therefore distinguish it from *Wallasey Tenants Ass'n v. Varner,* 892 A.2d 1135 (D.C.2006), where we held that "'the transfer of the ... property *to the grantor's wholly owned corporation,* or the transfer from one corporation to another corporation owned and controlled by the same interests' ... does not result in a change in ownership or control and therefore does not [constitute a sale]." *Id.* at 1140–41 (emphasis in original; citation omitted). Unlike the grantor in *Wallasey Tenants,* 1899 LLC does not "wholly-own[]" and "wholly-control[]" the grantee

In sum, we agree with the trial court that the transaction under review constituted (or, more accurately, included) a sale governed by D.C.Code § 42–1705.[20]

## B. There Was No Written Listing Agreement

■ The Developers assert that, if the transfer of the Property was a sale, D.C.Code § 42–1705 compels the conclusion that Insignia cannot recover any compensation whatsoever, absent a written listing agreement or contract.[21] They give two independent reasons why the February 20th Letter is not an enforceable "written listing agreement"—(1) the Developers never signed it, and, in any event, (2) there was no meeting of the minds on the terms contained within it. The parties have engaged in a spirited debate about whether there was a meeting of the minds, whether Spitz orally approved the February 20th Letter, and whether oral approval would have been legally effective in this context. We conclude that there is a simpler answer.

Even if the February 20th Letter is a binding contract, it does not constitute "a written listing agreement." D.C.Code § 42–1702(14) (2001), defines the equivalent term, "written listing contract," as:

a contract between a broker and an owner in which the owner grants to the broker the right to find a purchaser for a designated property at the price and terms the owner agrees to accept, and the broker, for a fee, commission, or other valuable consideration, promises to make a reasonable effort to obtain a purchaser for the term of the contract.

The February 20th Letter does not meet these requirements because it does not contemplate the sale or purchase of the Property. As we have explained above, the possibility of selling the Property first emerged in a new version of the engagement letter that Spitz sent to Insignia on March 5th. Thus, there was no "written listing agreement" in this case.[22]

Insignia suggests that § 42–1705 was designed to protect individuals who buy residences, and that the Council never intended for it to apply to commercial transactions involving sophisticated business persons. The legislative history Insignia points to does not support its argument, however, and the plain language of the statute applies to "the sale of *all* real property." *Cf. RDP Development Corp. v. Schwartz*, 657 A.2d 301, 307 (D.C.1995) (rejecting argument that provision of Real Estate Licensure Act, then codified at D.C.Code § 45–1926(c) (repealed), "was

---

Kan Am 1899. *Id.* at 1140. In addition, unlike the transaction in *Wallasey*, the one at issue here effected a complete "change in ownership [and] control." *Id.* at 1141. Any assessment of this transaction under the "'general principles'" adopted in *Wallasey*, *id.* at 1140–41, compels the conclusion that this was, in fact, a sale.

20. Because they are not at issue here, we express no views on the tax consequences of this transaction under the Internal Revenue Code.

21. Although § 42–1705 refers to "a written listing agreement," the corresponding definitional section addresses a slightly different

term—"written listing contract." D.C.Code § 42–1702(14) (2001). We reject any suggestion that the Council intended to distinguish between a "written listing contract" and a "written listing agreement."

22. Because we conclude that the contents of the letter do not meet the requirements of a written listing agreement, we do not reach the question of whether it would defeat the purpose of the statute to treat a written document, orally agreed to, as a written listing agreement. *Cf. Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995) (recognizing that assent to a written contract may be demonstrated by conduct, even if a signature is lacking).

not intended to apply to commercial real estate transactions involving knowledgeable and sophisticated parties who are capable of protecting themselves"). Therefore, we apply the statute to this case and hold that Insignia "shall not receive payment of a commission" on the sale of the Property.

## C. Legal and Factual Issues Remain

■ The conclusions we have reached thus far do not dispose of this case, however. It would be a gross understatement to say that this transaction was merely a sale. Moreover, although the statute precludes a licensee from "receiv[ing] payment of a commission" on the sale of real property, Insignia apparently never expected to be compensated in that fashion. According to Insignia, the Developers explicitly stated that they did not want to sell the Property. For several months thereafter, Insignia invested considerable time, talent, and effort preparing the Offering Memorandum and otherwise assisting the Developers in finding a source (or sources) to refinance their debt or recapitalize their business. So far as we can tell from the record, Spitz first mentioned the possibility of a sale in his March 5th letter, and even then it appeared to be only one of three options. He stated that 1899 LLC had "presented the property for sale, joint venture equity financing and debt financing to West-Wind." Thus, even after March 5th, it was far from clear that a sale of the Property would occur.

Speaking colloquially, the prospect of a sale emerged late in the game. Up until March 5th, no one would have thought that D.C.Code § 42–1705 applied to the parties' relationship at all. Therefore, there would have been no legal requirement for Insignia to insist that the terms of its compensation be set forth in a written contract. On remand, the court should consider whether, as Insignia asserts, the parties

reached an oral agreement on how Insignia would be compensated for its efforts to help the Developers attract refinancing or recapitalization. *See Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.,* 940 A.2d 996, 1002 (D.C.2008) (discussing the prerequisites for an enforceable contract). There would have been nothing "illegal" about an oral contract formed before a sale was contemplated. *Cf. Cevern, Inc. v. Ferbish,* 666 A.2d 17, 19–20 (D.C.1995) (discussing principle "that an illegal contract, made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no right upon the wrongdoer").

The trial court should also consider whether the February 20th Letter was a binding contract, even if it does not qualify as a "written listing agreement." Although the court held that this document was not a binding contract, it did so "because the letter's ratification was contingent upon an event that did not occur— defendant Spitz's signing and ratification of the agreement." We conclude that this issue must be examined anew. Walter Rector undoubtedly could establish preconditions for the effectiveness of his own "execution and delivery," *see Schlosberg v. Shannon & Luchs Co.,* 53 A.2d 722, 723 (D.C.1947) ("[O]ne may sign an agreement on condition that he shall not be bound thereby until another also signs ...."), but it is not clear as a matter of fact or law that he had the authority to restrict the manner in which Christian Spitz could give his assent to the February 20th Letter. *See Davis v. Winfield,* 664 A.2d 836, 838 (D.C.1995) (recognizing that assent to a written contract may be demonstrated by conduct, even if a signature is lacking). Moreover, Insignia asserts that Rector's approval was irrelevant because Spitz "had sole and exclusive authority to 'negotiate and enter' a professional services contract

with Insignia on behalf of 1899 LLC." Resolving these issues apparently will, among other things, require examination of the agreements governing 1899 LLC. With respect to some of Insignia's claims, however, its after-acquired knowledge of how 1899 LLC was governed may be less important than the contemporaneous representations of Rector and Spitz.

We note that this letter sets forth a "schedule of fees" by which Insignia would be compensated; none of these fees are contingent upon a sale of the Property, nor are they calculated based on a sale price. If this schedule of fees becomes relevant, what did the parties mean by the terms "refinancing," "financing," "total debt capital committed," and "total equity capital committed"? Did the transaction that occurred fit within these terms? If the parties did reach an agreement, whether oral or written, had WestWind been "carved out" so that Insignia would not be entitled to compensation if a deal with WestWind was consummated? Even if there was no agreement, a contract may have been implied by the conduct of the parties. *See generally Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Insurance Co.*, 870 A.2d 58, 62 (D.C.2005). Alternatively, Insignia may be entitled to recover the value of its services (or a portion of them) under an "unjust enrichment" theory. *See id.* at 63.

 We agree with the trial court that, if there is no written listing agreement, a licensee may not seek to "receive payment of a commission" on the sale of real property by alleging that the parties had reached an oral agreement, that a contract was implied in fact, or that he is entitled to compensation for the value of his services. Thus, we do not suggest that a licensee who assists in the sale of real property may avoid the force of D.C.Code § 42–1705 by suing on alternative theories. However, this was a complex transaction, and the intentions of the parties evolved over a period of several months. At the outset, they did not contemplate that the Property would be sold. A statute that prevents a licensee from receiving a commission for the sale of real property, in the absence of a written listing agreement, does not necessarily preclude that licensee from receiving compensation for services contracted-for and provided before it was clear that the Property would be sold. We cannot at this point say that "there is no genuine issue as to any material fact and that [the Developers are] entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c). Further inquiry is necessary to determine whether Insignia is entitled to some form of compensation for its efforts to assist the Developers in refinancing their debt or recapitalizing their business.

## V. Conclusion

We agree that the transfer of the Property from 1899 LLC to Kan Am 1899 was a sale and that the February 20th Letter was not a written listing agreement. Therefore, D.C.Code § 42–1705 precludes Insignia from "receiv[ing] payment of a commission" on the sale of the Property. However, at this stage of the litigation, we cannot rule out the possibility that Insignia is entitled to some form of compensation. We vacate the judgment of the Superior Court and remand for further proceedings consistent with this opinion.[23]

*So ordered.*

---

**23.** Insignia represents that it does not contest the dismissal of Counts VII and VIII, so those

allegations will not be at issue on remand. All other counts are remanded for further consideration.