Armentha **CAMPBELL,**
**et al., Appellants,**

v.

Raymon **NOBLE, Appellee.**

No. 06–CV–1430.

District of Columbia Court of Appeals.

Argued Nov. 19, 2008.

Decided Dec. 18, 2008.

---

Jay S. Marks, for appellants.

Richard E. Schimel, Bethesda, MD, for appellee.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and KING, Senior Judge.

FISHER, Associate Judge:

Thirteen-year-old Elijah Campbell was viciously mauled by pit bulls that belonged to Aaron Harris. A default judgment in the amount of $1,115,111.25 was entered against Harris, but it is doubtful that anything approaching this amount can be collected, so Elijah and his mother sought to hold the landlord, Raymon Noble, liable for his injuries. The Superior Court granted summary judgment to appellee Noble because he had no authority under the lease to evict Harris for keeping pit bulls. We affirm.

### The Basic Facts

Defendant/appellee Raymon Noble owned a building at 733 8th Street, S.E., Washington, D.C., and rented the first floor to Aaron Harris, who ran a tattoo parlor on the premises. After the lease was signed, Dr. Noble learned that Mr. Harris was keeping pit bulls in a fenced enclosure outside the building. Several months before the attack on Elijah Campbell, the dogs escaped from their pen and chased Virginia Foote, who worked in the adjacent building. Mrs. Foote's husband protested to Dr. Noble, who thus became aware of the dogs' aggressive tendencies. Dr. Noble was also aware that the dogs would occasionally frighten other neighbors and children by leaping against the fence and barking ferociously. Although Dr. Noble wrote Mr. Harris a letter describing the incident with Mrs. Foote and emphasizing the need for Mr. Harris to maintain good relations with the neighbors, he never told Mr. Harris to get rid of the dogs.

On June 17, 2001, Elijah Campbell, a thirteen-year-old boy with severe auditory and oral impairment, went to the tattoo parlor to ask Mr. Harris for a job. Mr. Harris offered to pay Elijah for cleaning up the dogs' waste and took him outside into the pen with the dogs. When Elijah inquired, Mr. Harris told him that the dogs did not bite. As Elijah began cleaning up the waste, Mr. Harris received a phone call and went back inside the parlor. The wind slammed the door shut behind him, trapping Elijah in the pen. The dogs

then began to attack Elijah, biting him in the face and body. Eventually, Mr. Harris returned outside and pulled the dogs off the boy. Elijah was rushed to the hospital, where he underwent nine hours of surgery. Since the attack, Elijah has had physical and psychological difficulties. He had to relearn how to balance and walk, and he has had terrible nightmares about the attack; he also no longer has a right ear. His left ear was surgically reattached.

## Our Standard of Review

This court reviews a grant of summary judgment *de novo*. *CB Richard Ellis Real Estate Servs., Inc. v. Spitz*, 950 A.2d 704, 710 (D.C.2008). "Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citations omitted). "Although we must view the record in the light most favorable to the non-moving party, . . . [t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Blodgett v. University Club*, 930 A.2d 210, 217 (D.C.2007) (internal quotation marks and citations omitted).

## Legal Analysis

 Appellants argue that a jury must determine whether appellee Noble breached a duty to Elijah by failing to evict Mr. Harris or force him to get rid of the dogs. Our case law establishes that an owner of property has a duty to exercise reasonable care to cure a dangerous condition if (1) he has actual or constructive notice of the condition and (2) he has the right to exercise control over the condition. *Youssef v. 3636 Corp.*, 777 A.2d 787, 795 (D.C.2001); *Settles v. Redstone Development Corp.*, 797 A.2d 692, 695–96 (D.C.

2002). Where the owner has ceded "the entire possession and control of the premises" to the tenant, the general rule is that the owner has no liability for incidents arising out of negligent or dangerous conditions on the premises. *Id. See also Karl W. Corby Co. v. Zimmer*, 99 A.2d 485, 486 (D.C.1953) (noting that at common law, the "tenant was the 'owner' of the premises for the term of his tenancy, and being in control of the premises as a whole, was responsible for its maintenance and upkeep.").

██ It is not contested that Dr. Noble had notice of the presence and aggressive behavior of the pit bulls: Dr. Noble had seen the dogs himself, he had received complaints from a neighbor regarding the dogs' behavior, and he had written a letter warning Mr. Harris that the dogs could prove to be a legal and financial liability. However, appellee breached no duty unless he also had the legal authority to control the presence of the dogs. *Settles*, 797 A.2d at 695 ("When an injury occurs on a portion of the premises or because of an instrumentality exclusively under the control of the tenant, the landlord is not liable since he exercises no measure of control over the area or the instrumentality.").

The parties agree that the lease did not contain a "no pets" clause. When the trial judge asked appellants' counsel what gave Dr. Noble the right to control the presence of the dogs, he had no ready answer, instead urging the court to "look at [the control] prong of the test broadly." Counsel also conceded at oral argument before this court that appellee Noble almost certainly would have lost had he asked the landlord-tenant court to evict Mr. Harris. Counsel candidly acknowledged that he is looking to this court to create the authority for a landlord to evict a tenant who keeps a pit bull or other dangerous dog.

In essence, appellants want us, on public policy grounds, to treat pit bulls (and other aggressive dogs) as dangerous instrumentalities and to hold that every lease contains implied authority for the landlord to evict tenants who own or harbor these animals.

We decline this invitation to legislate from the bench. The Council of the District of Columbia has already considered whether to ban "dangerous dogs" from the District altogether, and has decided not to do so. D.C.Code §§ 8–1901 to 8–1908 (2001). The legislature has instead authorized the Mayor to impound a dog when there is "probable cause to believe that [it] is a dangerous dog and may pose an immediate threat of serious harm to human beings or other domestic animals...." D.C.Code § 8–1902(b) (2001). The Mayor may also convene an administrative hearing "for the purpose of determining whether the dog in question shall be declared a dangerous dog and to determine if the dog would constitute a significant threat to the public health and safety if returned to its owner." D.C.Code § 8–1902(a) (2001).

"A dangerous dog determined to constitute a significant threat to the public health and safety if returned to its owner may be humanely destroyed." D.C.Code § 8–1903 (2001). If a dog is determined to be dangerous, but not a significant threat, the statute requires the owner, among other things, to register the animal as a "dangerous dog," to secure liability insurance, and to keep the dog securely confined in a "proper enclosure" with a "conspicuous warning symbol that informs children of the presence of a dangerous dog." D.C.Code § 8–1904 (2001). Violation of these requirements leads to civil penalties. Furthermore, if a dangerous dog "causes serious injury to or kills a human being or a domestic animal without provocation," the owner may be fined up to $10,000. D.C.Code § 8–1906(b) (2001).

Appellants argue that these provisions apply to Dr. Noble because the term "owner" is defined to include a person "possessing, harboring, keeping, having an interest in, or having control or custody of a dog." D.C.Code § 8–1901(4) (2001). However, jurisdictions interpreting similar "owner or harborer" language have consistently held that a landlord does not become an owner or harborer of his tenant's dog simply by virtue of being a landlord. *See, e.g., Auster v. Norwalk United Methodist Church,* 286 Conn. 152, 943 A.2d 391, 397 (2008); *Vennes for Vennes v. Miller,* 287 Mont. 263, 954 P.2d 736, 738 (1998); *Clemmons v. Fidler,* 58 Wash.App. 32, 791 P.2d 257, 259 (1990). We agree. Moreover, even if Dr. Noble *were* considered to be a harborer of Mr. Harris's dogs, nothing in the statutory scheme imposes liability on the owner or harborer in the absence of an administrative determination that the dog is dangerous. *See* D.C.Code §§ 8–1902 and 8–1906 (2001). Because the legislature has declined to ban all dangerous dogs from the District, or to automatically consider all dogs of a certain breed to be dangerous, we do not believe it is our role to adopt a more sweeping prohibition on public policy grounds.

Appellants turn, in the alternative, to the tort of negligence, principally relying on the decision in *Matthews v. Amberwood Associates Ltd. Partnership, Inc.,* 351 Md. 544, 719 A.2d 119 (1998). In *Matthews,* the tenant, Ms. Morton, kept a pit bull named Rampage in her apartment. *Id.* at 121. The dog was known for being vicious when he was out of Ms. Morton's presence, and, when she would leave him tied up on the grounds of the property, Rampage would "attempt to attack people." *Id.* Ms. Morton's lease with Amberwood Associates contained a "no pets" clause, but

Amberwood Associates did not enforce the clause even though it knew about the presence and vicious nature of the dog. *Id.* at 121.

On a tragic day, the plaintiff, Mrs. Matthews, came to visit Ms. Morton in her apartment, bringing her sixteen-month-old son, Tevin. *Id.* at 121–22. Ms. Morton was called away from the apartment, and while she was gone, Rampage began to attack and bite Tevin. *Id.* at 122. Mrs. Matthews was unable to free her son, and by the time Ms. Morton returned and the two women were able to extract Tevin, the child was so severely injured that he died in the hospital. *Id.* The Maryland Court of Appeals upheld a finding that Amberwood Associates was liable for Tevin's death because "[b]y the terms of the lease, the landlord had retained a large measure of control over the presence of such an animal in the leased premises." *Id.* at 126–27. The court held that this factor, "coupled with the knowledge of past vicious behavior by the animal, the extremely dangerous nature of pit bull dogs, and the foreseeability of harm to persons and property in the apartment complex," justified imposing liability on the landlord. *Id.* at 131.

We express no opinion on whether *Matthews* was correctly decided. However, even if we applied that case law here, it would not entitle appellants to relief. The landlord was held liable in *Matthews* because he (1) had ample notice that the tenant was keeping a dangerous pit bull and (2) failed to enforce a "no pets" clause in the lease. *Id.* at 131. Here it is agreed that there was no similar clause in the lease giving the landlord control over the premises. Notice that a tenant's dog is

dangerous is not sufficient to hold a landlord liable for its actions, even under *Matthews*. *See Settles*, 797 A.2d at 696 (holding that a landlord is not liable for injury to a third party on leased premises, even if he is on notice of the danger, unless he has "retained sufficient control to create a duty on his part to exercise due care in maintaining the area.").

### Conclusion

Because the appellants have not shown that there is a genuine issue of material fact, appellee is entitled to judgment as a matter of law. We affirm the trial court's grant of summary judgment.[1]

*So ordered.*

---

1. Because we hold that there is no legal basis for finding the landlord liable on this record, we do not consider appellee's alternative argument that the actions of the tenant in leaving Elijah alone with the dogs constitute an intervening or supervening cause that would relieve the landlord of liability.